Francisco A. Villegas (Bar No. 206997)
Evan M. Rosenbaum (Bar No. 310414)
fvillegas@villegascefo.com
erosenbaum@villegascefo.com
**VILLEGAS & CEFO, LLP**
1350 Avenue of the Americas, Floor 2
New York, NY 10019
Telephone: (646) 844-0679

Attorneys for Plaintiff
VIXLY AS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VIXLY AS,<br><br>Plaintiff,<br><br>vs.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Case No. 3:26-cv-10855<br><br>COMPLAINT FOR PATENT INFRINGEMENT<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Vixly AS ("Vixly") brings this action against Defendant Microsoft Corporation ("Microsoft") and alleges as follows:

## NATURE OF THE ACTION

1. This action concerns Microsoft's infringement of at least claim 11 of U.S. Patent No. 10,263,902, titled "Device and System for Selective Forwarding" (the "'902 Patent").

2. Claim 11 does not claim the result of improved routing or quality of service. It recites a specific technological improvement in how that result is achieved: a private transport network with multiple points of presence ("PoPs") connected by guaranteed bandwidth channels; a transport relay within that network; a control server that prevents unauthorized access; a first terminal that sends authorization information (through the origination-side ISP network) to gain admission; and latency-sensitive data addressed to the relay so that it traverses the private network before reaching a second terminal through the destination-side ISP network. Microsoft's relayed Teams media flows use that claimed architecture and packet-flow sequence.

3. A true and correct copy of the '902 Patent is attached as **Exhibit 1**. An exemplary claim chart mapping claim 11 of the '902 Patent to the Accused Instrumentalities (*infra* ¶ 37) is attached as **Exhibit 2**. Both are incorporated by reference.

## PARTIES

4. Vixly is a Norwegian private limited company with its principal place of business at Rektor Qvigstads gate 5, 9009 Tromsø, Troms, Norway. Vixly was formerly named Media Network Services AS, the entity identified as assignee on the face of the '902 Patent. On December 5, 2023, the company changed its name to Vixly AS. That was a change of name only. Media Network Services AS acquired all right, title, and interest in the invention, including all continuations, divisionals, and continuations-in-part, from the named inventors, Tarik Cicic and Haakon Bryhni, by an assignment executed on August 5, 2010 and recorded with the United States Patent and Trademark Office. Vixly has owned all right, title, and interest in the '902 Patent at all times relevant to this action, including on the date this Complaint was filed, and holds the exclusive right to sue for and to recover damages for past, present, and future infringement.

5. Microsoft is a corporation organized under the laws of the State of Washington, with its principal place of business at One Microsoft Way, Redmond, Washington 98052-6399. Microsoft is registered to do business in California and may be served through its registered agent, CSC - Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

## JURISDICTION

6. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States.

7. Microsoft is subject to personal jurisdiction in this District because it has purposefully made, used, offered, and provided the Accused Instrumentalities in this District; supplied Microsoft Teams and Microsoft 365 services to users in this District; and committed acts of infringement in this District.

## VENUE

8. Venue is proper under 28 U.S.C. § 1400(b) because Microsoft has committed acts of infringement in this District and maintains a regular and established place of business at 1045 La Avenida Street, Mountain View, California 94043. Microsoft identifies that facility as its Silicon Valley location and holds it out as a Microsoft office. On information and belief, Microsoft employees regularly conduct business there relating to Microsoft's software, cloud, communications, and networking products and services. https://www.microsoft.com/en-us/hub/locations (last visited Sept. 21, 2026).

## FACTUAL BACKGROUND

***The Network Problem Addressed by the '902 Patent***

9. Real-time audio and video are carried in packets that must arrive quickly and consistently. Excess delay, delay variation, or packet loss produces audible gaps, frozen video, and degraded calls. Before January 2, 2008, the technical literature treated bandwidth, delay and delay jitter, and packet loss as measurable network-performance constraints for IP telephony and streaming media. Victor Firoiu et al., Theories and Models for Internet Quality of Service, 90 Proc. IEEE 1565, 1565-66 (2002) (**Ex. 3** at 1-2); Brian E. Carpenter & Kathleen

Nichols, Differentiated Services in the Internet, 90 Proc. IEEE 1479, 1479, 1481-83 (2002) (**Ex. 4** at 1, 3-5).

10. The ordinary Internet did not give an endpoint control over the end-to-end path. An endpoint selected a destination, routers selected each hop, packets commonly crossed multiple administrative domains, and best-effort service permitted buffering or discarding packets during congestion. Those characteristics were particularly harmful to interactive and bandwidth-demanding applications. ’902 Patent, 1:25-2:11.

11. The literature identified traffic conditioning, admission control, resource reservation, routing, and capacity planning as network-control mechanisms operating at different locations and time scales. It also recognized that scalable quality of service required coordination between the data plane and control plane. Firoiu et al., 90 Proc. IEEE at 1565-66, 1568-69, 1574-77 (**Ex. 3** at 1-2, 4-5, 10-13).

12. The two principal quality-of-service frameworks (Integrated and Differentiated) did not solve the problem claimed by the ’902 Patent. Integrated Services required per-flow reservations and state at every router along a path, creating substantial signaling and scalability burdens. Differentiated Services aggregated traffic within an administrative domain, but did not provide hard end-to-end guarantees or permit one domain to allocate another domain’s resources. Carpenter & Nichols, 90 Proc. IEEE at 1480-85 (**Ex. 4** at 2-7); ’902 Patent, 2:55-3:8.

13. Conventional interdomain “hot-potato” routing created another problem. Providers commonly handed traffic to a neighboring network at the nearest available egress point to reduce their own bandwidth use. Changes in those egress decisions could cause longer convergence times, packet loss, forwarding loops, congestion, and abrupt shifts in traffic. Renata Teixeira et al., Dynamics of Hot-Potato Routing in IP Networks, 32 SIGMETRICS Performance Evaluation Review 307, 307-08, 315-16 (2004) (**Ex. 5** at 1-2, 9-10).

14. Other known approaches were incomplete. Private wide-area networks could provide reserved capacity, but were expensive and limited to fixed locations. Overlays and peer-to-peer networks could influence a path, but could not improve network quality without capacity guarantees. Existing guaranteed-bandwidth services did not extend to arbitrary communication

peers. ’902 Patent, 2:12-50. The technical problem was therefore not simply identifying a preferred destination. It was controlling how authorized latency-sensitive packets entered, traversed, and exited a quality-controlled path between users connected through different ISP networks.

***Vixly Developed the Claimed Network Architecture***

15. Vixly was founded in Oslo in 2007 to improve worldwide on-demand and live-video collaboration. Vixly developed and provided private-transport-network services for latency-sensitive communications, including videoconferencing. Vixly provided those services to customers globally, including in the United States, through videoconferencing and telepresence platforms.

16. Vixly’s technology originated from research by Dr. Tarik Cicic, a named inventor of the ’902 Patent and a founder of Vixly. Vixly sought patent protection for this technology beginning in January 2008.

17. Vixly commercialized the technology through a cloud-based, infrastructure/software-as-a-service platform that managed media flows and routing for latency-sensitive video traffic.

18. Vixly’s QoS.VC solution was designed to maintain quality of service under limited network capacity for voice over Internet protocol, videoconferencing, and video-on-demand applications. Its global network platform and real-time monitoring managed audio and video flows for which low latency and minimal packet loss were necessary to a high-quality two-way conference.

19. Vixly then engineered a network that kept authorized media traffic on its controlled network over long distances, rather than handing it off at the earliest egress. The architecture was designed to control latency and packet loss and to support connectivity across videoconferencing and telepresence platforms. Vixly deployed the service globally, including in the United States.

***The ’902 Patent Claims a Concrete Data-Transport Mechanism***

20. The ’902 Patent issued on April 16, 2019, from U.S. Patent Application No.

15/248,325. It claims priority to Norwegian Patent Application Nos. 20080027 and 20080028, both filed on January 2, 2008. ’902 Patent, 1:7-21.

21. The ’902 Patent identifies concrete shortcomings in then-existing Internet transport. Endpoints could select a destination but not the path; packets could traverse multiple administrative authorities; and best-effort routers could buffer or discard packets. Private networks, overlays, peer-to-peer systems, IntServ, and DiffServ each left unresolved problems of cost, capacity, scalability, access, or cross-domain control. ’902 Patent, 1:25-3:40.

22. The ’902 Patent describes a specific architecture for overcoming those shortcomings. Selected latency-sensitive traffic is redirected to a dedicated transport network; authentication, authorization, and accounting are integrated into the network service; global addresses are mapped to dedicated-network PoPs and relay addresses; and retransmission devices at multiple PoPs are connected by guaranteed bandwidth channels. ’902 Patent, 5:6-6:25.

23. Claim 11 recites a method performed using a private transport network containing multiple PoPs connected by guaranteed bandwidth channels, a transport relay inside the private network, a control server configured to prevent unauthorized access, and first and second data terminals. ’902 Patent, 10:22-39.

24. Claim 11 then requires the first terminal to send authorization information to the control server to gain admission to the private transport network and to address latency-sensitive data to the transport relay. That addressing causes the data to travel from the first terminal through the private network via the relay over a guaranteed bandwidth channel, and then to the second terminal. ’902 Patent, 10:40-53.

25. The admission-control limitation is a concrete network-access mechanism. The control server must prevent unauthorized parties from accessing the private transport network. The specification states that control servers “can be used for admission control, AAA and directory services,” and that access to the disclosed network “is strictly controlled and typically allowed to the paying customers only.” By excluding unauthorized traffic, the server protects the network’s finite, provisioned capacity for admitted traffic. ’902 Patent, 7:20-21, 7:49-52,

10:32-35; Firoiu et al., 90 Proc. IEEE at 1566, 1591 (**Ex. 3** at 2, 27).

26. The "guaranteed bandwidth channels" are concrete network links. The specification describes physical or virtual lines with guaranteed bandwidth, owned or leased from transport providers, that interconnect PoPs positioned near user ISP networks. '902 Patent, 5:55-62, 7:16-21, 7:29-32.

27. The claimed relay and addressing limitations change packet movement. Rather than sending media toward its ultimate peer and leaving the route to default Internet routing, the first terminal addresses the media to a relay inside the private network. The relay address causes the packet to enter and remain on the controlled transport network before delivery to the destination-side ISP network. '902 Patent, 6:8-53, 10:43-53.

28. The specification provides a concrete media-relay implementation using a modified Interactive Connectivity Establishment ("ICE") procedure. In that embodiment, the endpoint uses a transport relay as an outbound media proxy; the relay functions like a Traversal Using Relays around NAT ("TURN") server; and the endpoint uses the relay unless the other endpoint is reachable on the same network segment. '902 Patent, 8:18-42, fig. 10.

29. The claimed method changes how the network operates during session setup and packet transport. By combining controlled admission, relay addressing, multi-PoP private transport, and provisioned inter-PoP capacity, the claimed method keeps media off the uncontrolled, multi-domain best-effort path for the portion of the route most likely to introduce congestion, early handoff, jitter, and packet loss. It does so by changing the intermediate destination address, the network into which packets are admitted, and the links they traverse. None of these changes depend on the meaning of the media, human judgment, or a business rule.

***The Claimed Ordered Combination Was Not Routine or Conventional***

30. The patent's background and the cited pre-priority literature describe several existing networking tools. However, those tools addressed different problems. Routers forwarded packets hop by hop; private lines reserved capacity between fixed locations; SIP and H.323 proxies established calls; TURN relays helped traffic get past firewalls and network

address translators (NAT), which allow devices on a private network to reach public internet services by substituting a shared public IP address for their private addresses; VPNs connected designated sites; and IntServ and DiffServ attempted to improve quality of service. Nothing in those materials disclosed the sequence required by claim 11: authorization, admission to a private multi-PoP network, relay addressing, and transport over guaranteed bandwidth channels. '902 Patent, 3:40-62, 4:6-41; Firoiu et al., 90 Proc. IEEE at 1565-67, 1575, 1591 (**Ex. 3** at 1-3, 11, 27); Carpenter & Nichols, 90 Proc. IEEE at 1480-85 (**Ex. 4** at 2-7).

31. TURN addressed connectivity problem by allowing endpoints to exchange media through an external relay when a direct path was unavailable because of NAT or firewall restrictions. The endpoint sent its media to the relay, and the relay forwarded the packets to the destination. Conventional TURN did not admit the resulting media flow to a private multi-PoP network or carry that flow between PoPs over guaranteed-bandwidth channels. '902 Patent, 4:6-41.

32. VPNs served a different purpose. As described in the patent, they connected predetermined sites through a protected network established in advance. They did not provide claim 11's combination of terminal authorization, admission to a private transport network, relay addressing, and guaranteed inter-PoP transport between terminals connected through different ISP networks. '902 Patent, 2:22-39; *see also* Firoiu et al., 90 Proc. IEEE at 1566 (**Ex. 3** at 2).

33. As explained above, IntServ and DiffServ also did not supply the claimed architecture. IntServ reserved resources for individual flows along ordinary routes, requiring signaling and state at routers along the path that limited its scalability. DiffServ prioritized traffic classes within a single administrative domain but did not provide a hard end-to-end guarantee across independently administered domains. Extending quality of service across independently administered networks required inter-operator agreements and coordination. Neither framework provided the claimed private multi-PoP transport network, transport relay, or guaranteed bandwidth channels. '902 Patent, 2:55-3:8; Carpenter & Nichols, 90 Proc. IEEE at 1480-85 (**Ex.** 4 at 2-7).

34. Conventional Internet calling likewise left the media path to ordinary routing. A SIP or H.323 proxy established the session, but the media itself remained on the default Internet path. As the patent explains, "The media stream (250) takes the default path through the IP network (11, 13, 14) to the destination terminal." '902 Patent, 3:60-66. Under claim 11, the terminal addresses the latency-sensitive media to a relay inside the private network after authorization so that the packets enter and traverse that network rather than the default Internet path.

35. The technical gap was coordination. The known approaches did not describe the claimed sequence in which the first terminal sends authorization information to the control server to gain admission to the private transport network and then sends latency-sensitive data by addressing it to a relay inside that network, such that the data travels through the private network via the relay and a guaranteed-bandwidth channel, and then through the second ISP network to the second terminal. '902 Patent, Claim 11.

36. Contemporaneous literature likewise treated scalable quality-of-service control and multi-domain deployment as continuing challenges. A 2002 survey described lightweight signaling, endpoint or edge admission control, and centralized bandwidth brokers as approaches to scalable control-plane operations. It also identified control-plane scalability, protection against service theft, and inter-operator agreements for services spanning multiple network domains as open research issues, and stated that "Despite all this progress, however, we have not, as yet, seen wide-spread deployment of QoS services." Firoiu et al., 90 Proc. IEEE at 1575, 1590-91 (**Ex. 3** at 11, 26-27).

37. The claimed operations are interdependent. Admission control protects the provisioned capacity that relay addressing (which places admitted media onto the guaranteed bandwidth channels) makes available. None of these operations alone provides the claimed transport path. The ordered combination, considered as a whole, was not well-understood, routine, or conventional at the priority date.

***Microsoft's Accused Relayed Teams Media Flows***

38. The "Accused Instrumentalities" are relayed Microsoft Teams audio and video

sessions, such as calls or meetings, that employ Teams applications (downloaded or web-based), in which (a) Teams selects one or more Teams Transport Relay candidates, and (b) the resulting media is addressed to a Teams Transport Relay in the Microsoft 365 network segment and traverses at least one link connecting distinct PoPs within the wide-area network that Microsoft calls the Microsoft global network, the Microsoft WAN, and the Microsoft backbone (the "Microsoft Global Network").

39. Microsoft describes Microsoft 365 as a worldwide network segment with edges near customer networks. Its functions include "Transport Relay," conferencing server, and Media Processor. Microsoft also describes Teams audio, video, and screen-sharing traffic as real-time RTP media that is "highly latency sensitive." Microsoft, Microsoft Teams Call Flows, Microsoft Learn 2-3 (Mar. 30, 2026), https://learn.microsoft.com/en-us/microsoftteams/microsoft-teams-online-call-flows (**Ex. 6** at 2-3). On information and belief, the Microsoft 365 network segment, including its Teams Transport Relays, is part of the Microsoft Global Network. Microsoft, Microsoft Global Network, Microsoft Learn 2 (Apr. 6, 2023), https://learn.microsoft.com/en-us/azure/networking/microsoft-global-network (Ex. 8 at 2).

40. Microsoft implements Teams connectivity through standard ICE procedures. For example, in a one-to-one call, each Teams client obtains local, reflexive, and relay candidates consisting of IP addresses and ports; the clients exchange those candidates through Microsoft 365; STUN tests determine which candidate pairs work; and Teams selects the best working media path. Microsoft, Microsoft Teams Call Flows 3, 6-7 (Mar. 30, 2026) (**Ex. 6** at 3, 6-7).

41. When a relay path is selected, each client allocates a media-relay port on a Teams Transport Relay, sends its relay candidate in the Teams invite or answer, and transmits the SRTP-protected RTP/RTCP media to the selected relay candidate. The Transport Relay then relays the bidirectional media within Microsoft 365. Microsoft, Microsoft Teams Call Flows 6-9 (Mar. 30, 2026) (**Ex. 6** at 6-9).

42. The selected relay candidate supplies the destination IP address and port for the media packets. Thus, for an accused relayed session, the Teams client addresses the latency-

sensitive media to a transport relay within Microsoft 365, rather than addressing the media only to the remote user and accepting the ordinary direct Internet path. Microsoft, Microsoft Teams Call Flows 6-9 (Mar. 30, 2026) (**Ex. 6** at 6-9).

43. Microsoft controls access to those relays. Teams uses a credentials-based token for secure access to media relays over TURN, exchanges the token over a TLS-secured channel, and uses the TURN Digest challenge for media authentication. Teams authentication and authorization use Microsoft Entra ID and OAuth. Microsoft, Security Guide for Microsoft Teams Overview, Microsoft Learn 8-9 (July 16, 2026), https://learn.microsoft.com/en-us/microsoftteams/teams-security-guide (**Ex. 7** at 8-9). On information and belief, Microsoft's relay-allocation and authentication services validate the authorization information and prevent unauthorized clients from obtaining or using a relay allocation. The relay is the point of entry to the accused private transport path.

44. Microsoft also allows customers to require the relay route. It states that a customer may block a direct media path to "enforce a media path through Transport Relay in Microsoft 365." Microsoft, Microsoft Teams Call Flows 9 (Mar. 30, 2026) (**Ex. 6** at 9). In such sessions, compliance with Microsoft's relay-allocation, candidate-exchange, and ICE procedures is required to receive the relayed Teams service.

45. Microsoft states that after customer traffic enters Microsoft's network through an edge node, the data travels over optimized routes on Microsoft's wide-area network and "stays on [the] Microsoft network as long as possible before it's handed off." Traffic between Microsoft services, including Microsoft 365, routes within its global network and "never over the public Internet." Microsoft, Microsoft Global Network, Microsoft Learn 1-2 (Apr. 6, 2023), https://learn.microsoft.com/en-us/azure/networking/microsoft-global-network (**Ex. 8** at 1-2).

46. Microsoft's stated routing policy reverses the conventional practice described above. A conventional provider hands traffic to a neighboring network at the nearest available egress point in order to conserve its own capacity. Teixeira et al., 32 SIGMETRICS Performance Evaluation Review at 307-08 (**Ex. 5** at 1-2). Instead, Microsoft keeps the traffic on its own network "as long as possible before it's handed off." Microsoft, Microsoft Global

Network 2 (Apr. 6, 2023) (**Ex. 8** at 2). Microsoft therefore carries the accused media across infrastructure it controls rather than delivering it into third-party transit, which is the function claim 11 assigns to the private transport network.

47. Microsoft describes its wide-area network as a global mesh of edge nodes and datacenters with capacity designed to meet demand. Its globally distributed edge nodes function as PoPs because they are network locations where customer traffic enters or leaves the Microsoft Global Network and where Microsoft interconnects with other networks. Microsoft uses direct interconnects rather than transit links, invests in fiber capacity and path diversity, and controls the wide-area network through software-defined networking and a traffic-engineering platform extending to its optical networks. Microsoft, Microsoft Global Network 1-4 (Apr. 6, 2023) (**Ex. 8** at 1-4).

48. On information and belief, the Microsoft Global Network includes multiple PoPs connected by physical or virtual links with provisioned transmission capacity and managed through centralized software-defined traffic engineering. Microsoft's public statements regarding capacity, direct interconnects, fiber investment, and consistent service levels provide a factual basis for that allegation. Those inter-PoP links constitute guaranteed bandwidth channels within the meaning of claim 11.

49. Vixly accuses relayed sessions in which the first Teams terminal and second Teams terminal communicate with each other. Microsoft's call-flow diagrams identify separate customer, Internet or guest, and Microsoft 365 network segments and show relayed media entering Microsoft 365 from each side and traversing a Teams Transport Relay. Microsoft, Microsoft Teams Call Flows 2, 8-9 (Mar. 30, 2026) (**Ex. 6** at 2, 8-9).

50. Microsoft supplies and operates the Teams client software, Microsoft 365 signaling services, relay-allocation services, Teams Transport Relays, and the Microsoft wide-area network. The terminal-side steps are performed automatically by Microsoft's Teams client or web client, not by independently designed third-party software. Microsoft establishes the manner and timing of those steps through its software, credentials, ICE candidates, server responses, port-allocation process, and media protocols. Microsoft conditions the user's receipt

of the relayed Teams service on the client's performance of Microsoft's prescribed authorization, relay-allocation, candidate-exchange, and media-addressing procedures.

51. The attached claim chart provides an additional, nonexclusive example of how the accused relayed Teams sessions practice claim 11. **Ex. 2**.

**COUNT ONE - Direct Infringement of U.S. Patent No. 10,263,902 (35 U.S.C. § 271(a))**

52. Vixly incorporates by reference each of the foregoing paragraphs as if fully set forth here.

53. Microsoft has infringed and continues to directly infringe at least claim 11 of the '902 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents by performing, and directing or controlling the performance of, the method of claim 11 in the Accused Instrumentalities.

54. For an accused relayed Teams session, the first data terminal, running the Teams client, sends authorization information to Microsoft's control infrastructure to obtain access to the Teams Transport Relay; sends the latency-sensitive media to the second data terminal by addressing to the selected Teams Transport Relay IP address and port; and causes the media to travel from the first data terminal to the Microsoft Global Network via the first ISP network, through the Microsoft Global Network via the relay over a guaranteed bandwidth channel, and then to the second data terminal via the second ISP network.

55. Claim 11 recites two steps, both performed by the first data terminal. The remaining limitations describe the system in which those steps are performed and the transport path their performance causes. Microsoft directs or controls the first data termina's performance of both steps. Microsoft conditions both participation in an accused relayed Teams session and receipt of the benefit of that session on the Teams client following Microsoft-prescribed authentication, TURN, ICE, candidate-exchange, relay-allocation, and media-addressing procedures. A user who does not perform those steps receives no relayed Teams media. Microsoft determines the manner and timing of those acts through Teams software and Microsoft-operated servers. For the accused relayed sessions, every claimed step is attributable to Microsoft.

56. On information and belief, Microsoft also directly performs the claimed method when its employees or agents initiate accused relayed Teams sessions using Microsoft-operated client software, relay services, and network infrastructure in the United States.

57. Microsoft's infringement has injured Vixly. Vixly is entitled to damages adequate to compensate for Microsoft's infringement, in an amount to be determined at trial but not less than a reasonable royalty, together with interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Vixly respectfully requests that the Court enter judgment in its favor and grant the following relief:

A. A judgment that Microsoft has infringed and continues to infringe one or more claims of the '902 Patent;

B. An award of damages under 35 U.S.C. § 284 adequate to compensate Vixly for Microsoft's infringement, but in no event less than a reasonable royalty, together with pre- and post-judgment interest;

C. An accounting of, and an award of supplemental damages for, any infringement occurring after the period covered by the evidence presented at trial through entry of judgment;

D. An award of an ongoing royalty, in an amount to be determined by the Court, for any infringement occurring after entry of judgment; and

E. A finding that this case is exceptional under 35 U.S.C. § 285 and an award of Vixly's reasonable attorneys' fees and expenses; and

F. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Vixly demands a trial by jury on all issues so triable under Federal Rule of Civil Procedure 38(b) and N.D. Cal. Civ. L.R. 3-6.

Dated: September 23, 2026

By: */s/ Francisco Villegas*

Francisco A. Villegas
Evan M. Rosenbaum
VILLEGAS & CEFO, LLP

Attorneys for Plaintiff
VIXLY AS